**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| RICHARD E. SMITH, ) | CASE NO. 1:12-CV-2668 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | VECCHIARELLI |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | |
| Security, ) | **MEMORANDUM OPINION AND** |
| ) | **ORDER** |
| Defendant. | |

Plaintiff, Richard E. Smith ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On April 7, 2009, Plaintiff filed his application for SSI and alleged a disability onset date of September 1, 2005, which he later amended to April 7, 2009.  (Transcript ("Tr.") 13.)  The application was denied initially and upon reconsideration, and Plaintiff

---

[1]      On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  She is automatically substituted as the defendant in this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

requested a hearing before an administrative law judge ("ALJ").  (Tr. 13.)  On April 4,

2011, an ALJ held Plaintiff's hearing.  (*Id*.)  Plaintiff participated in the hearing, was

represented by counsel, and testified.  (*Id*.)  A vocational expert ("VE") also participated

and testified.  (*Id*.)  On April 20, 2011, the ALJ found Plaintiff not disabled.  (Tr. 13-25.)

On August 28, 2012, the Appeals Council declined to review the ALJ's decision, and

the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 25, 2012, Plaintiff filed his complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this case.  (Doc. Nos. 16, 18, 20.)  Plaintiff argues that – for various reasons –

substantial evidence does not support the ALJ's determination of Plaintiff's residual

functional capacity ("RFC"); and that the ALJ erred in concluding that Plaintiff was

capable of performing his past relevant work or performing work in the alternative

occupations identified by the VE.

## II.   EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on March 1, 1959.  (Tr. 24.)  In an undated Adult Disability

Report, Plaintiff reported that he could read and understand English, and could write

more than his name in English.  (Tr. 183.)  He reported that, in 2005, he had worked in

a factory as a laborer, and described his duties as "chipper & grinder, blow castings,

machine operation."  (Tr. 185.)  In that job, he had stood and walked for 10 hours each

day, and had sat for one hour.  (*Id*.)  In an April 7, 2009 Field Office Disability Report,

an agency employee noted that, during a face-to-face interview, Plaintiff had no

2

difficulty hearing, reading, breathing, understanding, being coherent, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands or writing.  (Tr. 192-93.)

Plaintiff attended ninth and tenth grades at Southview High School. (Tr. 227.) He withdrew from school in March 1977, during his tenth grade year, because he was "overage."  (*Id*.)  In ninth grade, Plaintiff received four C's, one B and one D during the first semester, and two D's and three F's during the second semester.  (Tr. 230.)  He was absent from school on three days during the first semester, and on 40 days during the second semester.  (*Id*.)  At the time of his withdrawal in tenth grade, Plaintiff had received F's in all of his subjects.  (*Id*.)  School records reflected that in 1972, an IQ test revealed that Plaintiff had an IQ of 66.  (Tr. 227.)

**B.    Medical Evidence**

**1.    Plaintiff's Treating Providers**

On September 8, 2005, Plaintiff reported to staff at Community Health Partners that, the day before, he had been hit in the head by a casting while working at Elyria Foundry.  (Tr. 273.)  He had a laceration that had been closed with staples.  (*Id*.)  He complained of neck discomfort.  (Tr. 274.)  A September 12, 2005 CT scan of Plaintiff's brain revealed soft tissue swelling and deformity over the site of Plaintiff's incision, but was otherwise normal.  (Tr. 275.)

Throughout 2007, while Plaintiff was incarcerated, he complained to prison medical staff of headaches.  (Tr. 278, 281, 283, 284.)  Medical staff prescribed Naprosyn and Ibuprofen.  (Tr. 278, 279.)

3

On June 8, 2009, Plaintiff sought treatment at the Nord Center, where a social worker performed a diagnostic assessment.  (Tr. 322-35.)  Plaintiff reported having been incarcerated for rape and parole violations from 1985 until 2005, and then again from 2006 until 2008 for receiving stolen property.  (Tr. 322.)  Plaintiff stated that he was having problems adjusting to life outside of prison, and told the social worker that he was "paranoid and does not like people and it is difficult for him to function in the community."  (*Id*.)  Plaintiff reported having been in "slow learners' classes" in school, and felt that his legal history made it difficult for him to find work.  (Tr. 324.)  With respect to "barriers to learning," Plaintiff stated that he had difficulty paying attention.  (*Id*.)  A mental status examination revealed that Plaintiff was depressed and anxious with logical, circumstantial, concrete and tangential thought process.  (Tr. 333.)  Plaintiff was cooperative but restless.  (*Id*.)  Plaintiff reported a history of using alcohol, marijuana, cocaine and LSD.  (Tr. 334.)

Nord Center staff diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood, cannabis abuse, cocaine abuse and bereavement (arising out of the recent deaths of his parents and friend).  (Tr. 331.)  Staff estimated Plaintiff's intelligence to be in the average range.  (Tr. 333.)

During appointments in July and August 2009, Plaintiff described his difficulties obtaining housing after a disagreement with his brother, with whom he had been living.  (Tr. 317, 318.)  Nord Center staff assisted him in finding housing via a community program.  (Tr. 317.)  However, because the housing program operated in a different county, Plaintiff no longer received services from the Nord Center after August 2009.  (Tr. 313.)

4

On September 9, 2009, Katherine Longsdorf, M.D., a physician at Third Street Family Health Services ("Third Street"), examined Plaintiff, noting his complaints of chronic headache following the 2005 head injury.  (Tr. 373.)  Plaintiff reported difficulty sleeping due to anxiety "since being released from prison almost a year ago."  (*Id.*) Plaintiff felt like people were staring at him, and reported trouble concentrating, focusing and motivating himself.  (*Id.*)  Dr. Longsdorf diagnosed Plaintiff with headaches and adjustment disorder with depressed mood.  (Tr. 375.)  She prescribed Neurotonin, Elavil and Naprosyn.  (Tr. 375.)

On September 21, 2009, Third Street social worker Colleen Shaughency, LISW, examined Plaintiff and diagnosed him with cocaine dependence (in remission), alcohol dependence (in remission), cannabis dependence (in remission), and episodic mood disorders.  (Tr. 372.)

On September 29, 2009, Kathy Short, D.O., examined Plaintiff at Third Street. (Tr. 369.)  She noted his complaints of deja vu, troubling sleeping, headaches, paranoia and depression.  (*Id.*)  Dr. Short noted that Plaintiff had "[a]nxiety related to adjusting to a different world than he knew when he went to prison."  (*Id.*)  She recommended that Plaintiff under a psychiatric evaluation, and prescribed Lexapro.  (Tr. 370.)

On October 6, 2009, Dr. Short noted that Plaintiff was depressed with a flat affect, but that he was cooperative and demonstrated no other abnormalities in behavior.  (Tr. 367-68.)  On October 20, 2009, Dr. Short changed Plaintiff's prescription to Wellbutrin because Plaintiff did not believe the Lexapro was effective.  (Tr. 364.)  On October 8, 2009, Ms. Shaughency noted that Plaintiff had completed a drug rehabilitation program, and was applying for jobs and investigating housing options.

5

(Tr. 366.)

On December 15,2009, pain management physician Theodore J. Togliatti, M.D., examined Plaintiff, noting his complaints of neck pain, headaches, and low back pain. (Tr. 360-61.)  Plaintiff described the pain as constant, and radiating into his left arm, with sharp, throbbing pain in his lower back.  (Tr. 360.)  Plaintiff rated his pain at 10 out 10 without medication, and as 7 out 10 with medication.  (*Id.*)  While medication and physical therapy alleviated his pain, walking and sitting exacerbated it.  (*Id.*)  Dr. Togliatti opined that Plaintiff "clearly has suffered a cervical sprain and strain but this has likely brought out the disabling reality of cervical degenerative disc disease."  (Tr. 361.)  Dr. Togliatti instructed Plaintiff to continue his regimen of Neurontin, Elavil and Naprosyn, obtain an MRI of his cervical spine, and follow up in four weeks.  (*Id.*)

On January 5, 2010, Ms. Shaughency examined Plaintiff, and noted that his mood and sleep had improved since he started taking Wellbutrin.  (Tr. 359.)  She noted that Plaintiff was nearing the end of his term of parole, and was making plans regarding his living arrangements.  (*Id.*)  She opined that Plaintiff had "few independent living skills," but was "motivated to learn as much as he can about making good decisions and thinking things through before acting."  (*Id.*)

On January 18, 2010, Dr. Short authored a letter in which she opined that Plaintiff "lacks the knowledge and social skills necessary to function in our society, especially in the employment field."  (Tr. 401.)  She estimated that Plaintiff's intelligence was "on the low end of normal," and that he would "need extensive training over several years to be able to obtain gainful employment."  (*Id.*)  According to Dr. Short, Plaintiff

6

"gets anxious when talking about living in a society that has rapidly progressed beyond his knowledge level." (*Id*.)  She opined that "placing [Plaintiff] in a work environment at this time potentially could worsen his level of depression." (*Id*.)

Dr. Short assigned Plaintiff a "less than moderate" limitation in his ability to maintain attention and concentration for two-hour periods, but opined that Plaintiff would likely be "a slow worker even if he understood the task at hand." (*Id*.)  According to Dr. Short, Plaintiff would require "transportation and a suitable living environment" and "extensive training and assisting" in order to maintain a regular work schedule and punctual attendance, but would still be moderately impaired in his ability to do so. (*Id*.) Similarly, she concluded that, with "extensive training and education to re-enter society," Plaintiff would be moderately limited in his ability to withstand the stresses and pressures of routine, unskilled work. (*Id*.)  She assigned him an unspecified limitation in his ability to make judgments that are commensurate with the functions of unskilled work, noting that Plaintiff "suffers from significant depression and has been incarcerated his adult life." (*Id*.)

Dr. Short concluded that Plaintiff "will not be able to maintain gainful employment with the depression and skill level he possesses.  He will have difficulty relating to others at both an employment and a personal level." (Tr. 402.)  Dr. Short noted that she was "a family practice physician who has a special interest in psychiatric medicine." (*Id*.)

In a February 9, 2010 medical source statement, Ms. Shaughency opined that Plaintiff had moderate limitations in performing work activities at a reasonable pace;

7

and keeping a regular work schedule and maintaining punctual attendance.  (Tr. 377.)
Ms. Shaughency assigned Plaintiff marked limitations in  maintaining attention and
concentration for two-hour periods of time; interacting appropriately with others;
withstanding the stress and pressures of routine, simple, unskilled work; and making
judgments that are commensurate with the functions of unskilled work.  (Tr. 377-78.)
She noted that Plaintiff's "attention span [and] concentration are low" and that his
"impulsivity may interfere with" maintaining a regular work schedule.  (Tr. 377.)  She
pointed to Plaintiff's "difficulty with others," with "difficulty dealing with crowds [and]
other people's behavior," and with "determining potential outcome[s] or consequences"
to support her opinions regarding his limitations.  (Tr. 377-78.)  Ms. Shaughency noted
that she "question[ed] his ability to maintain a job without intervention."  (Tr. 378.)

On January 31, 2011, a social worker from the Nord Center examined Plaintiff
after he reported to a hospital emergency room with depression and anxiety.  (Tr. 404.)
He told the social worker that he was homeless, and had been unable to find lodging
due to his criminal record.  (*Id.*)  He reported suicidal thoughts.  (Tr. 406.)  He reported
using cocaine and marijuana a few days before, and testing confirmed the presence of
cocaine and marijuana in his blood.  (Tr. 407, 482.)  The social worker diagnosed
Plaintiff with depressive disorder not otherwise specified, cocaine dependence and
major, recurrent, moderate depressive disorder.  (Tr. 408.)

## 2.    Agency Reports and Assessments

On May 1, 2009, agency consulting physician W. Jerry McCloud conducted a
physical RFC assessment.  (Tr. 303 -10.)  He opined that Plaintiff could: lift 50 pounds
occasionally and 25 pounds frequently; stand, walk and/or sit for six hours in an eight-

hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; and frequently reach in all directions with his left shoulder.  (Tr. 304-06.)  In an undated medical evaluation, agency consultant Rebecca Neiger, M.D., affirmed Dr. McCloud's RFC assessment.  (Tr. 342.)

On August 13, 2009, psychologist William B. Schonberg, Ph.D., examined Plaintiff at the request of the state agency.  (Tr. 336-41.)  Plaintiff reported that he was unable to work as the result of a head injury he received in 2005.  (Tr. 336.)  Plaintiff reported that he had started substance abuse treatment at the Volunteers of America on July 23, 2009, and admitted that he had abused alcohol, marijuana and crack cocaine "just before he entered treatment."  (Tr. 337.)

Dr. Schonberg described Plaintiff as "slightly withdrawn but cooperative," and noted that Plaintiff's thought processes were "logical, coherent and goal directed."  (Tr. 338.)  He reported that Plaintiff related "in a somewhat anxious but sensible manner."  (*Id*.)  Dr. Schonberg opined that Plaintiff's cognitive functioning was in the low average range, and that Plaintiff had "limited judgment and common sense reasoning ability to live independently, to make important decisions, and to manage his funds."  (Tr. 339.)  He diagnosed Plaintiff with multiple chemical dependencies, in early remission, as well as a personality disorder, not otherwise specified.  (*Id*.)  Dr. Schonberg concluded that Plaintiff was mildly impaired in his ability to understand, remember and follow directions.  (Tr. 340.)  He opined that Plaintiff was moderately impaired in his ability to: relate to others, including fellow workers and supervisors; maintain attention, concentration, persistence and pace to perform simple, repetitive tasks; and withstand the stress and pressures associated with day-to-day work activity.  (*Id*.)  Dr. Schonberg noted that

9

Plaintiff "did not demonstrate any comprehension or memory problems of a significant nature, but was vague at times during the assessment."  (*Id.*)  According to Dr. Schonberg, Plaintiff had the mental ability to perform simple, repetitive work tasks.  (*Id.*)

**C.    Hearing Testimony**

   **1.    Plaintiff's Hearing Testimony**

   At his April 4, 2011 administrative hearing, Plaintiff testified as follows:

   He worked "chipping and grinding" at the foundry where he was injured.  (Tr. 41.) He described it as "basically like one job but you have . . . one person chipping and you have another person grinding."  (Tr. 42-43.)  He had only worked sporadically since then, and he believed that was due to his criminal record and his "trouble catching on to the job performance."  (Tr. 42.)  For example, in one temporary position that required Plaintiff to place pieces into a box, Plaintiff had grown confused about which way the pieces went, and had held up the production line.  (Tr. 44.)

   Plaintiff was not able to read or write, and had never held a job where he was required to do so.  (Tr. 51.)  He "tried to read the sports page sometimes," but could only make out the score and some of the players' names.  (Tr. 51-52.)  He had a driver's license, but someone at the bureau had read the necessary information to him. (Tr. 52.)  He was 18 years old when he left school during the ninth grade, and had been in special education classes.  (Tr. 53.)  During his incarceration, he had made six attempts to obtain a GED, but was not able to do so because the classes were "too hard."  (Tr. 53-54.)

   Plaintiff "never had [any] trouble with . . . any of the people [he] work[ed] with."

(Tr. 62.)  However, he had been discharged from his drug rehabilitation program before he officially completed it because he yelled at another patient.  (*Id*.)

### 2.    Testimony Regarding Plaintiff's Vocational History

The VE testified that Plaintiff's past relevant work was as a grinder/chipper, which was generally done at a heavy level with a special vocational profile ("SVP") of 3. (Tr. 63.)  The VE noted that, while Plaintiff described the job [in his statements to the agency] as having been light, the VE "question[ed] that description" because it was "very unusual for it to be that . . . light of an exertion."  (*Id*.)  Plaintiff explained that, when he worked at the foundry, he had first worked as a chipper/grinder and then switched to a different position – a "blowout job" –  when it became available.  (Tr. 64-65.)   The blowout job involved blowing sand out of casting.  (Tr. 65.)  According to Plaintiff, although the chipper/grinder position involved using a heavy grinding machine, the blowout was "light because I just had to stick a rod down into a casting and it just blew it out."  (Tr. 64.)  Plaintiff stated that he had worked as a chipper/grinder for approximately 30 days, and had worked in the blowout position for about six to seven months.  (Tr. 65, 66.)

The VE testified that Plaintiff's blowout position was equivalent to the core-blower position listed in the Dictionary of Occupational Titles ("DOT") at number 518.685-022, with a medium exertional level and an SVP of 2.  (Tr. 66)  The VE noted that Plaintiff had described the position as having a light exertional level.  (*Id*.)

The ALJ described the following hypothetical individual to the VE:

> If we assume that we have an individual who's 50 at onset,
> is currently 52 years old.  Has a limited education, didn't

11

> finish the ninth grade.  And has the past work experience
> that you have just described.  If we assume that this
> individual can perform medium work activity.  Should only
> occasionally climb ladders, ropes, and scaffolds.  That he
> should have only superficial interaction with others.  No
> intense . . . or confrontational interpersonal interactions.

(Tr. 67.)  The VE opined that the hypothetical individual could perform Plaintiff's past

relevant work as a blow off operator, as well as a laundry laborer, dishwasher, and

landscape specialist.  (*Id*.)  The ALJ asked the VE whether any of those jobs would

"require good reading and writing skills," and the VE responded that they would not.

(*Id*.)  The ALJ inquired whether a limitation on the individual's ability to turn his head

would affect the VE's testimony:

> Q:      Now, if we were to add that this individual could
>         frequently but not constantly turn his head throughout
>         an eight-hour workday, how would it affect the
>         numbers of these jobs?
>
>                                 *  *  *
>
> A:      The only one that I'm hesitating about is the
>         landscape specialist job.  I don't believe the turning of
>         the head would be a problem . . . as long as it's not
>         constant.  I believe that would still be okay.

(Tr. 67-68.)

Plaintiff's counsel questioned the VE regarding his understanding and application

of the limitation to superficial, non-confrontational interactions with others:

> Q:      And the hypothetical question about the superficial
>         interaction with others . . . how did you interpret that
>         limitation?
>
> A:      Well . . . the one point that the [ALJ] mentioned, no
>         confrontation . . . not much disagreement.  Just . . .
>         simple instruction giving, instruction taking and

12

something very casual and directive [*sic*] without a whole lot of decision making.

Q:  To your knowledge are there very many unskilled jobs that require more than what you've characterized as superficial interaction?

A:  No, I believe most SVP 1 and 2 jobs do not have much confrontation and, you know, complicated interactions with others.

Q:  And there was another sentence in the hypothetical question about no intense confrontational interpersonal interactions.

A:  Yes.

Q:  What did you understand that to mean as an additional qualifier?

A:  Well, as you just pointed out, I think most jobs at the SVP 1 and 2 level are not going to have that particular characteristic anyway.  But it just means that you're not going to get into an argument.  You're not going to get into major disagreements with people you work with, or with the public with that particular limitation.

Q:  All right.  And if . . . an occasional unskilled job supervisor is a confrontational supervisor that might change, is that right?

A:  Yes, it could, it could be difficult for someone with that limitation to work for them, yes.

Q:  Okay.  And we don't know anything about the particular likelihood of such confrontational supervision styles being in these particular occupations, do we?

A:  No, I . . . could not make a[n] educational guess on that.

(Tr. 68-70.)

13

Plaintiff's counsel also inquired whether the VE knew if any of the identified jobs required the ability to read and write in English.  (Tr. 70.)  The VE responded that, "the jobs I gave are not going to require the . . . ability to read and write in English," and "could be done through verbal instructions."  (*Id*.)  Plaintiff's counsel pointed out that the jobs identified by the VE all required a GED reasoning level of 2, and the VE agreed that, according to the DOT listings, "all of them have an R2 level," which would require "deal[ing] with problems involving a few concrete variables in or from standardized situations."  (Tr. 71.)  However, the VE noted that the R level "doesn't really address the reading and writing question," and stated, "In practice I don't understand why a dishwasher would need . . . to read or write, nor a landscape laborer or landscape specialist."  (Tr. 71.)

Thereafter, the ALJ asked the VE whether his testimony was consistent with the DOT:

> Q:    [T]he testimony you've given, it is consistent with
>        information in the DOT?
>
> A:    Yes, your honor.
>
> Q:    Okay. . . . [H]ow would you explain any differences as
>        far as reading and writing for a dishwasher?
>
> A:    Well . . . the DOT . . . says . . . there are some simple
>        instructions.  I find in practice and most situations a
>        dishwasher doesn't have to read or write anything
>        and the same thing with the laundry laborer, which is
>        one reason I . . . gave those jobs.

(Tr. 74.)  Further, the VE noted that a jobs "R" level "discuss[es] reasoning ability more so than actual ability to read or write."  (*Id*.)  Finally, the VE verified that his testimony was based on his experience and education.  (*Id*.)

14

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

15

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent him from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff has not engaged in substantial gainful activity since April 7, 2009, the
      application date.

2.    Plaintiff has the following severe impairments: drug and/or alcohol addiction; a
      personality disorder; depressive disorder; an anxiety disorder; a possible learning
      disorder; and cervical degenerative disc disease.

3.    Plaintiff does not have an impairment or combination of impairments that meets
      or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart
      P, Appendix 1.

4.    Plaintiff has the RFC to perform a limited range of medium work.  Plaintiff can lift
      and/or carry 50 pounds occasionally and 25 pounds frequently.  He should only
      occasionally climb ladders, ropes, and scaffolds.  He can frequently, but not
      constantly, turn his head during an eight-hour workday.  Plaintiff should have
      only superficial interactions with others, but no intense or confrontational
      interpersonal interactions.

5.    Plaintiff is capable of performing past relevant work as a core blower operator.
      This work does not require the performance of work-related activities precluded
      by Plaintiff's RFC.

6.    Plaintiff has not been under a disability, as defined in the Act, since April 7,2009,
      the date the application was filed.

(Tr. 15-25.)  The ALJ also made the alternative conclusion, at step five of the sequential

analysis, that Plaintiff was capable of performing work as a laundry laborer, dishwasher

or landscape specialist.  (Tr. 24.)

## V.    LAW & ANALYSIS

**A.    Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    Plaintiff's Assignments of Error**

Plaintiff argues that substantial evidence does not support the ALJ's decision

17

because, for various reasons, the ALJ erred in assessing the medical evidence in the record, determining Plaintiff's RFC, and concluding that Plaintiff was capable of performing either his past relevant work or other jobs available in the national economy. The Commissioner generally contends that substantial evidence supports the ALJ's decision.

### 1.    Dr. Short's Opinion

Plaintiff argues that the ALJ erred in failing to assign controlling weight to Dr. Short's opinion that Plaintiff was essentially incapable of working.  There is no dispute that Dr. Short was Plaintiff's treating physician.  Generally, a treating source's opinion is entitled to controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). However, an ALJ may assign a treating source's opinion little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Here, the ALJ assigned "no weight" to Dr. Short's opinion (Tr. 23), finding that it was inconsistent with other contents of the record:

18

> Kathy Short, D.O., C.M.O, provided several findings and opinions.  Only three weeks after her first appointment with [Plaintiff], Dr. Short opined that [Plaintiff] would have difficulty relating to others at both the employment and personal level.  This opinion is contradicted by [Plaintiff's] own testimony during the hearing that he generally gets along well with others.  Dr. Short also opined that [Plaintiff] would have adjustment problems due to his reentry into society after 23 years in prison, but she is again contradicted by [Plaintiff's] successful work history at the foundry for nearly a year after his 2005 release from his longest prison sentence.  Dr. Short's opinion that [Plaintiff] 'will not be able to maintain gainful employment with the depression and skill level he possesses' is inconsistent with her vague commentary regarding [Plaintiff's] moderate abilities within her narrative report as well as [Plaintiff's] own performance of substantial gainful activity throughout most of 2005 at a semi-skilled job.
>
> \*  \*  \*
>
> Dr. Short's opinions are inconsistent with her own vague comments of [Plaintiff's] moderate abilities within her own narrative report as well as [Plaintiff's] successful performance of substantial gainful activity throughout most of 2005.

(Tr. 20, 23.)

Plaintiff argues that substantial evidence does not support any of the reasons provided by the ALJ for assigning less than controlling weight to Dr. Short's opinion.[2] Plaintiff notes that Dr. Short had treated Plaintiff for four months – rather than three weeks, as stated by the ALJ – before giving her opinion regarding his ability to work. Plaintiff is correct.  Dr. Short first examined Plaintiff on September 29, 2009.  (Tr. 369.)

---

[2]     Plaintiff also argues that the ALJ "did not make the threshold finding about whether any of Dr. Short's opinions were entitled to 'controlling weight.'" (Plaintiff's Brief ("Pl. Br.") at 6.)  However, the ALJ's decision to assign no weight to Dr. Short's opinion addresses this issue.

19

Her letter regarding Plaintiff's capabilities is dated January 18, 2010.  (Tr. 359.)  The ALJ misstated the length of time Dr. Short treated Plaintiff before opining about his ability to work.  Were this the only basis for the ALJ's decision to assign no weight to Dr. Short's opinion, this error might require remand.  However, as discussed below, because substantial evidence supports the ALJ's other reasons for assigning less than controlling weight to Dr. Short's opinion, this error does not require remand in this case.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (noting that, when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game") (internal quotation marks omitted).

Plaintiff asserts that the ALJ's reasoning that Dr. Short's opinion was inconsistent with Plaintiff's testimony that he got along well with others is, itself, inconsistent with the ALJ's finding that Plaintiff had moderate limitations in social functioning, and fails to account for the difference between working and generally interacting with others in other settings.  These arguments lack merit.  In finding that Plaintiff had moderate limitations in social functioning – a finding that Plaintiff does not challenge – the ALJ acknowledged Plaintiff's difficulties in this area, but also pointed to Plaintiff's testimony that he had no trouble relating to co-workers or with his adult children.  In other words, in finding a moderate limitation, the ALJ relied on Plaintiff's testimony regarding his ability to get along with his co-workers.  Accordingly, the ALJ's reasoning with respect to Dr. Short's opinion is consistent with his own determination of Plaintiff's ability to function socially.  Further, Plaintiff testified specifically that he was able to get along well with his co-workers – not, as Plaintiff characterizes it in his argument, that he was

20

generally able to get along well with others.  Accordingly, the ALJ did not err in relying on Plaintiff's testimony to find that Dr. Short's opinion was inconsistent with other evidence in the record in this case.

Plaintiff contends that the ALJ erred in relying on Plaintiff's employment at the foundry in 2005 to discredit Dr. Short's opinion that Plaintiff would not be able to adjust to work as a result of his incarceration.  Plaintiff asserts that the ALJ's observation on this point – specifically that Plaintiff worked at the foundry after his "longest prison sentence" – was "odd" and irrelevant because Plaintiff was incarcerated a second time after working at the foundry.  (Pl. Br. 7.)  This argument lacks merit, as the import of the ALJ's reasoning is clear:  Plaintiff's employment at the foundry was evidence that he was sufficiently able to readjust to working after having been in prison for 20 years, and did not support Dr. Short's opinion that Plaintiff was unable to work as a result of his incarceration.  The ALJ's reference to Plaintiff's "longest prison sentence" reflects the ALJ's reasoning that, because Plaintiff had not described any difficulty returning to work after a 20-year prison sentence, it was not credible to conclude either that being incarcerated had rendered Plaintiff unable to work, or that a second, shorter incarceration would have a greater effect on his ability to work.

Finally, Plaintiff argues that the ALJ erred in relying on the skill level of Plaintiff's work at the foundry to discredit Dr. Short's opinion.  Specifically, Plaintiff argues that the ALJ's reasoning is "factually wrong" because his position at the foundry was unskilled, not semi-skilled.  (Pl. Br. 8.)  To support this argument, Plaintiff cites to the VE's testimony, and asserts that, during that testimony, the VE changed the skill level of Plaintiff's work at the foundry from skilled to unskilled.  This is a mischaracterization of

21

the record, as it suggests that the VE vacillated between two skill levels for the same position.  That is not the case.   Rather, during the VE's testimony, Plaintiff clarified that he had worked in two different positions at the foundry: as a chipper/grinder, which the VE classified as SVP 3; and as a blowout operator, which the VE classified as SVP 2. An occupation rated at an SVP 2 is unskilled; an SVP 3 occupation is semi-skilled. S.S.R. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).

Plaintiff notes that, at one point in his decision, the ALJ stated that Plaintiff had worked at a semi-skilled position for "nearly a year" (Tr. 20) – which is not accurate, as Plaintiff worked the majority of his time at the foundry in the unskilled blowout operator position.  As a preliminary matter, Plaintiff does not explain how the distinction between semi-skilled and unskilled undermines this element of the ALJ's reasoning.  Moreover, later in his opinion, the ALJ pointed to Plaintiff's "successful performance of substantial gainful activity throughout most of 2005" as justification for assigning Dr. Short's opinion little weight.  The record supports this characterization of Plaintiff's work history. Accordingly, substantial evidence supports the ALJ's decision to afford Dr. Short's opinion no weight.[3]

---

[3]     The Commissioner points to other evidence in the record that supports the ALJ's decision to assign less than controlling weight to Dr. Short's opinion. However, the ALJ did not rely on any of these bases in deciding this issue.  Accordingly, this Court will not consider them.  *See Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (internal quotation marks omitted).

### 2.     Other Medical Opinions

Plaintiff argues that the ALJ erred in failing to properly analyze the opinions of Drs. Togliatti, Schonberg, McCloud and Niger, and Ms. Shaughency.  Each of these arguments fails.

### a.     Dr. Togliatti

Plaintiff notes that the ALJ omitted any reference to Dr. Togliatti's statement that Plaintiff's cervical sprain and strain "has likely brought out the disabling reality of cervical degenerative disc disease."  (Tr. 361.)  Plaintiff, however, does not explain how this ambiguous statement, which, at best, constitutes an opinion on an issue that is reserved for the Commissioner, *see Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985), compels a different outcome in this case.  This is true particularly given that the ALJ determined that cervical degenerative disc disease was one of Plaintiff's severe impairments.  Accordingly, this argument lacks merit.

### b.     Dr. Schonberg

Plaintiff argues that the ALJ failed to explain his decision to assign "limited weight" to Dr. Schonberg's opinion and to reject Dr. Schonberg's conclusion that Plaintiff was limited to simple, repetitive tasks.  A review of the decision reveals that, while not as clear or straightforward as the ALJ's discussion of other medical sources, the ALJ's review of Dr. Schonberg's opinion reflects his bases for assigning it limited weight.

The ALJ first discussed Dr. Schonberg's opinion at page 21 of his decision:

> [Plainitff] has a long history of dependency upon cocaine,
> marijuana, and alcohol. [Dr. Schonberg] noted that

23

> [Plaintiff's] dependency was in early remission in August
> 2009.  Dr. Schonberg noted that [Plaintiff] "did not
> demonstrate any comprehension or memory problems of a
> significant nature" during the evaluation. [Plaintiff] testified
> during the hearing that he completed the Volunteers of
> America drug and/or alcohol addiction program successfully
> [in 2009].  However, when [Plaintiff] was hospitalized in
> January 2011 for suicidal ideations, he tested positive for
> cocaine and marijuana.

(Tr. 21.)  Thereafter, the ALJ discussed other evidence regarding Plaintiff's mental

capabilities, including evidence that his concentration and memory were not

significantly impaired, noting that Plaintiff "was articulate and focused while giv[ing] his

testimony and demonstrated no memory problems when giving explicit descriptions of

his past work, treatment, and activities of daily living.  (Tr. 21-22.)  Then, the ALJ

returned to Dr. Schonberg's opinion:

> Limited weight is given to the findings and opinions provided
> by [Dr. Schonberg].  The undersigned notes [Plaintiff's]
> incarcerations, his denial of depression and use of
> substances following his Volunteers of America admission to
> get sober in July 2009, and his ability to get along with other
> and not isolate himself as reported to Dr. Schonberg.  The
> undersigned agrees that [Plaintiff] has moderate limitations,
> but not such a degree that he is limited to performing simple
> work tasks only.

(Tr. 22.)  Taken together, these portions of the ALJ's decision reflect that he relied on

multiple bases –  Dr. Schonberg's observation that Plaintiff did not have significant

comprehension or memory problems; his own observations of Plaintiff at the

administrative hearing; and other evidence in the record –  to assign limited weight to

Dr. Schonberg's opinion that Plaintiff was restricted to simple, repetitive tasks and was

otherwise moderately impaired in areas related to working.  These bases are all evident

in the record and, thus, substantial evidence supports the ALJ's decision to assign

limited weight to Dr. Schonberg's opinion.

### c.    Drs. McCloud and Neiger

In his decision, the ALJ rejected the opinion of Drs. McCloud and Neiger that Plaintiff was limited to frequently reaching, noting that "the medical evidence indicates that [Plaintiff's] neck impairment has improved."  (Tr. 22.)  Plaintiff contends that the ALJ's analysis is not sufficient because he failed to identify "which evidence and when." (Pl. Br. 11.)  This argument has no merit, as in the paragraph immediately prior to the ALJ's discussion of these opinions, the ALJ sets forth the medical evidence to support his decision to reject the conclusion that Plaintiff was limited to frequently reaching:

> Although it is apparent that [Plaintiff] sustained a significant injury while working at the foundry, the medical evidence indicates [that] his symptoms improved by May 2006.  After his second release from prison in 2008, [Plaintiff] sought very little treatment for his neck pain.  In June and December 2008, Plaintiff reported to [his chiropractor] that his neck pain was only intermittent.  Throughout the hearing, [Plaintiff] turned his head frequently without the appearance of pain.  He testified that he walks for exercise and can even play basketball some days.

(Tr. 22.)

### d.    Ms. Shaughency

The ALJ assigned "[l]ittle to no weight" to the opinion of Ms. Shaughency, noting that "[h]er opinion contradicts [Plaintiff's] own statements to Dr. Schonberg," that Ms. Shaughency had "admitted that she had conducted no testing and had nothing upon which to base her opinion regarding [Plaintiff's] learning disorder or any of the other diagnoses she listed in her report," and, finally, that Ms. Shaughency had examined Plaintiff only three times prior to giving her opinion.  (Tr. 23.)  Plaintiff contends that the

ALJ erred in failing to "specify which statements to Dr. Schonberg were inconsistent with" Ms. Shaughency's opinions, and that the ALJ's reasons were "insufficient to justify discarding a major source of evidence."  Plaintiff's argument lacks merit, as he fails to cite any authority requiring either a particular level of specificity or a different standard for assessing the opinions of so-called "major" sources of evidence.  Here, the ALJ's bases for rejecting the opinion of Ms. Shaughency are evident from the record, and substantial evidence supports the ALJ's decision on this issue.

### 3.    RFC Non-Exertional Limitations

Plaintiff argues that the ALJ's calculation of his RFC failed to sufficiently address his mental limitations.  At step three of the sequential analysis, the ALJ determined that Plaintiff had "moderate difficulties" in social functioning, and "mild to moderate difficulties" in sustaining concentration, persistence or pace.  (Tr. 18.)  The ALJ assigned Plaintiff the following mental restrictions in his RFC:

> [Plaintiff] should have only superficial interactions with others with no intense or confrontational interpersonal interactions.

(Tr. 19.)  Plaintiff cites to *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), to support his contention that the RFC did not sufficiently address his moderate difficulties in social functioning, and mild-to-moderate difficulties in concentration, persistence and pace.  Plaintiff's argument is not well taken, as *Ealy* is distinguishable from this case.

In *Ealy*, the record showed that the claimant had a limited ability to maintain attention over time, even when performing simple, repetitive tasks.  *Ealy*, 594 F.3d at 516.  Specifically, a state agency psychological consultant limited the claimant's ability

26

to sustain attention to complete simple repetitive tasks to "[two-hour] segments over an eight-hour day where speed was not critical." *Id.*  The ALJ, however, limited the claimant only to simple, repetitive tasks without any additional time-based limitations. Accordingly, the Sixth Circuit found that the ALJ failed to capture the claimant's limitations in concentration, persistence, and pace adequately. *Id.*

*Ealy* undoubtedly stands for the proposition that an ALJ's hypothetical to a VE must adequately describe a claimant's limitations in order to serve as substantial evidence in support of the ALJ's conclusions. *Id.* at 517.  However, *Ealy* "does not require further limitations . . . for every individual found to have moderate difficulties in concentration, persistence, or pace." *Jackson v. Comm'r of Soc. Sec.*, No. 1:10-cv-763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011) (Boyko, J.).  Rather, "*Ealy* stands for a limited, fact-based[] ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions." *Id.* at 4.

Here, the record does not support Plaintiff's contention that, because the ALJ found him to be moderately limited in social functioning and mild-to-moderately limited in concentration, persistence and pace, the ALJ was required to incorporate additional limitations into the RFC.  Plaintiff points to no medical evidence in the record to support his contention.  Accordingly, the record supports the conclusion that Plaintiff's particular moderate limitations did not require restrictions in addition to those assigned by the ALJ and, thus, *Ealy* does not require remand in this case.

Plaintiff also contends that the VE misunderstood the ALJ's hypothetical limiting Plaintiff to superficial, non-confrontational interactions with other people.  According to

27

Plaintiff, the VE understood the limitation "to rule out only higher work functions not ordinarily found in unskilled work," and, thus, the "the hypothetical question, as understood by the VE, did not impose a meaningful restriction on unskilled work and is inconsistent with the finding of moderate difficulties in social functioning."  (Pl. Br. 13.) This argument lacks merit because Plaintiff mischaracterizes the VE's testimony. Although the VE did testify that the limitation would rule out jobs with SVPs greater than 2, he also testified that he understood the limitation to prohibit specific characteristics in any job, without regard to its skill level.  The VE testified that he understood the restriction to preclude jobs that involved disagreements and decision making, and to require "simple instruction giving, instruction taking and something very casual."  (Tr. 69.)  In other words, the VE did not apply the limitation merely to generally rule out entire categories of jobs based on their skill levels, but, rather, to determine whether the specific jobs he identified matched the description in the RFC.  This argument does not merit remand in this case.

### 4.    Step Four

Under the regulations, a claimant is not disabled if he can perform past relevant work, either as "he . . . actually performed it," or "as ordinarily required by employers throughout the national economy," as it is described in the DOT.  S.S.R. 82-61, 1982 WL 31387, *1-2 (1982).  Plaintiff argues that the ALJ erred in determining that Plaintiff could perform his past relevant work as a core blower operator, either as that job is generally performed or as Plaintiff had actually performed it.  This argument lacks merit.

Plaintiff contends that the ALJ erred in failing to compare the requirements of the job as Plaintiff performed it to the limitations in Plaintiff's RFC to determine whether

28

Plaintiff could perform the work.  According to Plaintiff, this error prejudiced him because, when he worked as core blower operator, he had been required to stand and walk for 10 hours, which is greater than the amount of standing or walking that is included in the medium exertional level assigned in his RFC.

Plaintiff is correct in noting that the record contains evidence that he was required to stand for 10 hours when he worked as a core blower operator.  (Tr. 185.) Work at the medium exertional level "requires standing or walking, off and on, for a total of approximately six hours in an right-hour workday."  S.S.R. 83-10, 1983 WL 31251, *6 (1983).  The ALJ did not resolve this conflict in his decision, and, thus, substantial evidence may not support the ALJ's conclusion that Plaintiff could perform his past relevant work as he actually performed it.  However, because, as discussed below, substantial evidence supports the conclusion that Plaintiff could perform his past relevant work as it was generally performed in the national economy, to the extent the ALJ erred on this point, remand is not required.  *See* Kobetic, 114 F. App'x at 173.

The DOT describes the position of core blower operator as medium work, DOT 518.685-022, 1991 WL 673872 (1991), which corresponds to the limitation included in Plaintiff's RFC.  Plaintiff contends that the ALJ erred in determining that Plaintiff could perform the job as generally described because Plaintiff's "job [at the foundry] was a composite job, involving both chipping/grinding and blow-out."  (Pl. Br. 15.)  This argument, however, relies on Plaintiff's mischaracterization of the nature of Plaintiff's work at the foundry.  Plaintiff did not testify that he had worked in a position that involved elements of both jobs.  Rather, Plaintiff testified that he had initially worked as a chipper/grinder, and then switched to the core blower operator position.  (Tr. 64-65.)

29

The two positions were separate jobs. Accordingly, there is no evidence that Plaintiff worked a composite job, and substantial evidence supports the ALJ's conclusion that Plaintiff could perform his past relevant work as it was generally performed in the national economy.[4]

### 5. Step Five

Plaintiff argues that the ALJ erred in concluding at step five, as an alternative to his finding at step four, that Plaintiff could also perform other jobs that existed in the national economy. Plaintiff contends that, because the VE could not accurately testify regarding how many of the identified positions were either part time or involved supervisors that were confrontational, the VE's testimony was unreliable, and the ALJ erred in relying on it. Given that substantial evidence supports the ALJ's decision at step four that Plaintiff could perform his past relevant work, this Court need not address this argument. However, even if this Court were to consider this argument, it would lack merit. It is unreasonable to expect a VE to have knowledge regarding – or the DOT to include – a criteria that is not only subjective and impossible to measure, but that is also specific to the personalities of the individuals involved in a particular job or workplace.

---

[4]     In his brief, Plaintiff cites to instances in the record where he listed both positions as his past work. (Pl. Br. 15, citing Tr. 196, 202.) In an April 2009 Work History Report, Plaintiff described his work at Elyria Foundry as "blow out/ working with machine chipping and grinding." (Tr. 196.) Later in that same document, he indicated that his job title at Elyria Foundry was "chipping and grinding/blow out." (Tr. 202.) Neither of these instances, however, compel the conclusion that Plaintiff worked a composite job involving elements of both positions, particularly in light of his testimony describing his work history at the foundry.

**6.      IQ Testing**

Finally, Plaintiff argues that the ALJ erred in failing to obtain IQ testing.  Plaintiff does not explain how obtaining such testing may have altered the outcome in this case. To the extent that he argues that such testing would have revealed a disability or required further limitations, the record does not support such an argument.  Rather, the record reflects – and the ALJ noted -- that several of Plaintiff's examining physicians and therapists noted that his cognitive functioning was within the normal range.  (Tr. 333 (Nord Center), 339 (Dr. Schonberg), 401 (Dr. Short).)  The ALJ noted that Plaintiff was "articulate and focused during his testimony."  (Tr. 21-22.)  Accordingly, substantial evidence supports the ALJ's decision not to obtain IQ testing in this case.[5]

## VI.      CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 8, 2013

---

[5]      Plaintiff notes that the ALJ pointed to Plaintiff's history of working in a semi-skilled position for "approximately 9 months" to determine that IQ testing was not necessary in this matter.  (Tr. 21.)  As discussed above, the record reflects that Plaintiff worked as a blow out operator –an unskilled position – for the majority of the time he worked at the foundry. He worked in the skilled position of chipper/grinder for only one month. (Tr. 64-65.)  However, even if this constitutes error, because the other bases for the ALJ's decision – Plaintiff's testimony and the opinions of physicians and therapists that Plaintiff's cognitive functioning was within the normal range – support the ALJ's decision to decline to obtain IQ testing, remand is not necessary in this case.